******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

M. S. *v.* P. S.*
(AC 41790)

Bright, C. J., and Alvord and Alexander, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court
dissolving his marriage to the plaintiff and from the order of that court
awarding the plaintiff pendente lite attorney's fees. In the judgment
dissolving the marriage, the court, inter alia, ordered the defendant to
pay alimony to the plaintiff for a maximum term of six years and modified
a relocation provision in the parties' agreed on pendente lite custody
and parenting access plan to permit the plaintiff to relocate across state
lines but within thirty-five miles of her current residence. *Held*:
1. The trial court did not abuse its discretion in fashioning its support orders;
although the support orders account for approximately 90 percent of
the defendant's net weekly income, the orders were not excessive in
light of an essentially even distribution of the marital property, leaving
the defendant valuable assets that he would be able to use to comply
with the support orders and sustain his basic welfare, and the six year
term for alimony, which was appropriate in light of the facts and circum-
stances of the case, and which could not be extended.
2. The trial court did not abuse its discretion or deprive the defendant of
due process when it permitted the plaintiff to relocate across state
lines to within thirty-five miles of her then current residence: the court
determined that it was in the children's best interests to allow the
plaintiff to relocate in order to establish residency in the state of New
York so that she could afford and attend a doctorate program, which
would provide her a necessary opportunity for meaningful employment
and income, and the court reasonably tethered the distance for the
relocation to the plaintiff's home as she was the party seeking permission
to relocate; moreover, the court's order did not deviate from the parties'
expressed belief and agreement that it was in the children's best interests
that the parties live within thirty-five miles of each other unless otherwise
agreed in writing.
3. The trial court did not abuse its discretion in the amount of attorney's
fees pendente lite that it awarded to the plaintiff: in assessing the reason-
ableness of the fee request, the court appropriately considered the ser-
vices rendered by the plaintiff's counsel as well as her skill level and
experience and corresponding billing rate, which were testified to by
the plaintiff's counsel and reflected in fee affidavits with attached billing
records; moreover, the court determined that certain billing entries were
excessive and identified on the record examples of entries it reduced.

Argued December 3, 2020—officially released March 23, 2021

*Procedural History*

Action for the dissolution of a marriage, and for other
relief, brought to the Superior Court in the judicial dis-
trict of Danbury, where the court, *Eschuk, J.*, granted
in part the plaintiff's motion for pendente lite attorney's
fees, and the defendant appealed to this court; there-
after, the court, *Hon. Sydney Axelrod*, judge trial ref-
eree, rendered judgment dissolving the marriage and
granting certain other relief, from which the defendant
filed an amended appeal; subsequently, the court, *Hon.
Sydney Axelrod*, judge trial referee, issued articulations
of its decision. *Affirmed.*

*Logan A. Carducci*, for the appellant (defendant).

*Danielle J. B. Edwards*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. The defendant, P. S., appeals from the judgment of dissolution and the pendente lite order of the court awarding the plaintiff, M. S., attorney's fees.[1] On appeal, the defendant claims that the court abused its discretion in (1) entering an excessive support order that consumes approximately 90 percent of the defendant's income and leaves him with insufficient income to pay for his basic needs, (2) entering an order permitting the plaintiff to relocate thirty-five miles from her current residence rather than the mutually agreed upon thirty-five miles from the other party's residence, and (3) awarding the plaintiff attorney's fees when the amounts billed were excessive and unreasonable. We affirm the judgment of the court.

The record reveals the following relevant facts and procedural history. The parties were married on March 1, 2008, and are the parents of two minor children. The plaintiff initiated this dissolution action in September, 2017. The plaintiff also filed, pursuant to General Statutes § 46b-15, an application for relief from abuse seeking a temporary restraining order against the defendant. After a three day hearing, the court, *Hon. Sydney Axelrod*, judge trial referee, issued a restraining order on September 29, 2017.

On October 13, 2017, the plaintiff filed a motion for attorney's fees pendente lite, and the court, *Eschuk, J.*, held a hearing on February 5 and May 31, 2018. On May 31, 2018, the court ordered the defendant to pay $75,000 in attorney's fees to counsel for the plaintiff. On June 20, 2018, the defendant appealed from the attorney's fees order. Also on June 20, 2018, the plaintiff filed another motion for attorney's fees pendente lite. On November 30, 2018, following an eight day trial in the dissolution action, the court, *Hon. Sidney Axelrod*, judge trial referee, ordered the defendant to pay an additional $15,000 in attorney's fees to counsel for the plaintiff.

Also on November 30, 2018, the court issued its memorandum of decision, in which it dissolved the parties' marriage and entered various financial and custody orders. In its memorandum of decision, the court found that the plaintiff had obtained associate's and bachelor's degrees in fashion in 2000. Although she had worked in fashion prior to the marriage, she did not work in that industry during the marriage and did not intend to return to that industry. The plaintiff intended to pursue master's and doctorate degrees in clinical psychology at the University of Albany, and she had been notified that her application to that school had been approved. She could afford the program, which would take six years to obtain both degrees, if she were able to establish New York residency. The degrees obtained through the program would provide the plaintiff with a greater

opportunity for employment and income.

At the time of the dissolution, the plaintiff's only source of income was the pendente lite support received from the defendant. Her financial affidavit reflected liabilities of $167,200, including $165,360 in fees owed to her counsel, $75,000 of which the defendant had been ordered to pay pendente lite. At the time of the dissolution, the defendant had paid $10,000 of the pendente lite fees to the plaintiff's attorney. The plaintiff held bank accounts totaling $1360 and an IRA with a balance of $7448. She previously had taken a distribution of $37,000 from her IRA to pay legal fees.

The parties owned a marital home located in Newtown. The title was held in both parties' names. The home was purchased in 2009 for $685,000. The defendant had paid 20 percent of the purchase price in cash, and the balance was paid by the defendant's father as a gift. At the time of dissolution, the home had a fair market value of $575,000 and the equity was $575,000. The parties also owned three vehicles. The plaintiff owned, in her name alone, a 2007 Honda with equity of $4000. The defendant owned, in his name alone, a 2016 Mazda CX9 with a value of $25,273 and a loan balance of $25,273, and a 2016 Mazda CX5 with equity of $16,860.[2]

The defendant had obtained a bachelor's degree in engineering and mechanical industrial engineering in Rio de Janeiro in 2003, and a master's of business administration degree from the University of Chicago Booth School of Business in 2013. From January, 2007 through February, 2009, the defendant was employed by JP Morgan Securities, Inc., as an analyst. From February, 2009 through August, 2011, the defendant was employed by Syllogistic Management, LLC, which he founded and managed. From July, 2013 through February, 2014, the defendant worked as a research associate for Consumer Edge Research, LLC. From March, 2014 through June, 2016, the defendant worked as a research associate for CRT Capital Group (CRT), earning an annual base salary of $100,000 together with a discretionary bonus. In 2015, the defendant's income from CRT was a salary of $100,000 plus a $15,000 bonus. CRT ceased operations in June, 2016, and the defendant's total 2016 gross pay from CRT through that date was $80,063.83.

From November, 2016 through the time of dissolution, the defendant worked for Accordion Partners (Accordion) as a consultant. The defendant was first employed by Accordion as an associate, and "his compensation was at the rate of $4000 per week or $80 per hour for his performance of services for the company. On November 23, 2016, an addendum was entered into with an employment contract to change $4000 per week to $5000 and change his title from associate to vice president to be effective as of November 30, 2017." In calendar year 2017, the defendant earned from Accor-

dion gross income of $133,934.20, which amounts to a gross weekly income of $2575.

Beginning January 1, 2018 through September 15, 2018, the defendant had earned from Accordion $30,604. The court rejected as not credible the defendant's claim that he earned less in 2018 because Accordion afforded him less opportunity to work. The court found that other than various trips he took,[3] the defendant had offered no valid reason why he had not worked more for Accordion in 2018. The court found that the defendant had an annual earning capacity of $110,000. The court also found that the income earned by the defendant was never enough to pay all of the household expenses and that the parties relied on the defendant's assets as well as gifts from the defendant's father to cover the shortfall. The court stated that the defendant received dividend income and interest income from Brazil that was not shown on many of his financial affidavits.

The court found that the defendant had total liabilities of $128,655, including tax liabilities for the years 2016 and 2017, reflecting years where he had not yet filed his income tax return, and the plaintiff's counsel fees in the pendente lite amount of $75,000, which he had been ordered to pay. The court found that the defendant held bank accounts totaling $6285 and assets consisting of stocks, bonds and mutual funds with a value of $116,725. The defendant also held $112,907 in retirement accounts.

The court found that, at the time the parties married, the defendant held assets in Brazil with a fair market value of $913,260. At the time of the dissolution, the defendant retained certain of those premarital assets. Specifically, he held $117,375 in Brazilian stocks, mutual funds, and checking accounts. The defendant also owned in Brazil an apartment with a value of $96,691 and land with a value of $8190, both properties he had inherited from his mother in 1990. The court also found that the defendant owned a 25 percent interest in an apartment in the Top Life Housing Complex in Brazil, which proportional interest was valued at $26,522. Although the defendant did not consider this asset to be his own and he did not include it on his financial affidavit, the court found that he did own such an interest, citing evidence introduced at trial in the form of the defendant's 2007 Brazilian tax return affidavit listing the interest.

The court issued the following support orders. It ordered the defendant to pay $390 weekly in child support and 70 percent of unreimbursed medical and qualified daycare costs.[4] The court also ordered the defendant to provide medical and dental insurance for the parties' children. With respect to alimony, the court ordered the defendant to pay the plaintiff $600 weekly until the death of either party, the remarriage of the

plaintiff, or six years from the date of the court's memorandum of decision, whichever shall sooner occur.[5] The court stated that the provisions of General Statutes § 46b-86 (a) and (b) are applicable. The court further provided that the term of alimony could not be extended. The court found that the amount of alimony it ordered was not sufficient to maintain permanently the standard of living of the plaintiff at the level she enjoyed during the marriage and stated that an increase in income of the defendant will justify modification of the alimony order.

With respect to property division, the court assigned to the plaintiff all of the rights, title and interest of the defendant in the marital home, which the court ordered the plaintiff to sell. The court ordered $200,000 from the net proceeds of the sale to be distributed to the defendant and the remainder of the net proceeds to be distributed to the plaintiff. With respect to the parties' vehicles, the court awarded the plaintiff the 2016 Mazda CX9, and ordered the defendant to make the monthly loan payments with respect to that vehicle. The plaintiff was to pay the insurance, property tax, maintenance and repairs on the 2016 Mazda CX9. The court awarded the 2007 Honda to the plaintiff and the 2016 Mazda CX5 to the defendant.

The court awarded the defendant all bank accounts shown on his financial affidavit under category C and all stocks, bonds, mutual funds and bond funds shown on his financial affidavit under category D. The court awarded the plaintiff all bank accounts shown on her financial affidavit and the IRA shown on her financial affidavit. The court ordered all retirement plans shown on the defendant's financial affidavit under category F to be divided equally between the parties. The court also ordered: "All of the defendant's inheritances shown on his financial affidavit in Brazil are awarded to the defendant including his 25 percent interest in the Top Life Housing complex that is not shown on his financial affidavit."[6] The court ordered that each party be responsible for the liabilities listed on his or her financial affidavit.

With respect to custody, the court found that the parties' pendente lite July 19, 2018 custody and parenting access plan was in the best interests of the children with one exception. The court modified the relocation provision of the plan to permit the plaintiff to "relocate with the minor children to the state of New York provided it is not more than thirty-five . . . miles from her current residence." The defendant filed an appeal from the court's judgment, which was treated as an amended appeal by this court.

On March 20, 2019, the defendant filed a motion for articulation, in which he requested that the court articulate, inter alia, the factual basis for its support and alimony orders. On April 29, 2019, the court issued an

articulation, stating: "The court found that the defendant has [an] earning capacity of $110,000 per year. Under the child support guidelines, that amounts to a net weekly income of $1286 after deducting all of the guideline amounts including medical/hospital/dental insurance premiums of $491. That results in a basic child support obligation of $390 per week and a division for unreimbursed medical [costs] with the defendant paying 70 percent and the plaintiff paying 30 percent. The support order was entered based on the defendant's earning capacity as found by the court and the child support guidelines. The alimony order was entered considering the provisions of . . . § 46b-82."[7] Additional facts and procedural history will be set forth as necessary.

Before turning to the claims on appeal, we note the applicable standard of review. "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case, such as demeanor and attitude of the parties at the hearing. . . . The test is whether the court could reasonably conclude as it did . . . indulging every presumption in its favor. . . . A trial court's conclusions are not erroneous unless they violate law, logic, or reason or are inconsistent with the subordinate facts in the finding. . . .

"Review of a trial court's exercise of its broad discretion in domestic relations cases is limited to whether that court correctly applied the law and whether it could reasonably conclude as it did. . . . The trial court must consider all relevant statutory criteria in a marital dissolution action but it does not have to make express findings as to the applicability of each criteria. . . . The trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case." (Citation omitted; internal quotation marks omitted.) *Bevilacqua* v. *Bevilacqua*, 201 Conn. App. 261, 265, 242 A.3d 542 (2020).

I

The defendant's first claim on appeal is that the court's support orders are excessive in that they leave the defendant with only approximately 10 percent of his net income to pay for his basic needs. We disagree that the court's support orders constituted an abuse of discretion.

The following additional procedural history and facts are relevant to this claim on appeal. In its memorandum of decision, the court found that the defendant had an earning capacity of $110,000 annually,[8] which, after

subtraction of the child support guideline deductions including but not limited to medical, hospital, and dental insurance premiums of $491, amounts to a net weekly income of $1286. The court ordered the defendant to pay the plaintiff $390 weekly in child support and $600 weekly in alimony. It also held the defendant responsible for the monthly loan payments on the 2016 Mazda CX9 that it had awarded to the plaintiff, which payment amounted to approximately $162 weekly.[9] After subtracting the support payments and vehicle loan payment from his net weekly income, $134 remains, which amounts to approximately 10 percent of his net weekly income.

Although the defendant does not challenge on appeal the court's orders regarding distribution of marital property, such orders are relevant. The court awarded the defendant $200,000 in proceeds from the sale of the marital home; $6285 in bank accounts; stocks, bonds, and mutual funds in the amount of $116,725; real estate and property in Brazil worth $131,409; $56,454 from his retirement accounts; and the 2016 Mazda CX5 valued at $16,860. The defendant was ordered to pay $90,000 in attorney's fees to the plaintiff's counsel. The court awarded the plaintiff $345,000 in equity in the marital home, $8808 in banking and IRA accounts, $56,454 from the defendant's retirement accounts, the 2007 Honda with equity of $4000, and the 2016 Mazda CX9 with a value of $25,273. Taking all of the above into account, the court ordered an essentially even distribution of the marital property, with each party receiving assets worth approximately $440,000.

We next set forth relevant principles of law. Section 46b-82 (a) provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment." "Trial courts . . . are afforded wide discretion in awarding alimony, provided that they consider all of the criteria enumerated in . . . § 46b-82." *Greco* v. *Greco*, 275 Conn. 348, 360, 880 A.2d 872 (2005). A party's "ability to pay is a material consideration in formulating financial awards." Id., 361.

In support of his claim that the trial court's support

orders are excessive, the defendant relies on *Valentine* v. *Valentine*, 149 Conn. App. 799, 800, 90 A.3d 300 (2014). In *Valentine*, the trial court found the defendant's net weekly income to be $957.52 and ordered the defendant to pay $300 weekly in child support and $300 weekly in periodic alimony for fourteen years. Id., 805–806. It also ordered him to transfer his rights, title, and interest in the marital home to the plaintiff, and further ordered that he assume all future mortgage payments, costs, and fees associated with the property. Id., 806. It also ordered the defendant to make several other payments to satisfy prior outstanding court orders, including $928 for child support, $16,200 for discovery noncompliance, $10,800 for parenting education noncompliance, $3250 for attorney's fees, $31,992 for mortgage arrearage, and $2400 for outstanding utilities, for total payments due in the amount of $65,570. Id. It also ordered the defendant to pay $10,000 toward the plaintiff's attorney's fees. Id. The court required the defendant to maintain a $500,000 life insurance policy, to provide health insurance for the plaintiff, to cover 62 percent of any uninsured medical expenses for the parties' two minor children, and to cover 50 percent of costs associated with the minor children's extracurricular activities. Id., 806–807. Significantly, the "court did not identify any valuable assets that the defendant could use to comply with its financial orders." Id., 807. This court determined that the court's financial orders were excessive, leaving the defendant with "little to no income to sustain his basic welfare." Id., 808.

The defendant also relies on *Greco* v. *Greco*, supra, 275 Conn. 362–63. In *Greco*, the trial court awarded the plaintiff 98.5 percent of the marital estate and ordered the defendant to pay the plaintiff $710 weekly in alimony and to maintain for the plaintiff's benefit two substantial insurance policies, which orders left the defendant with an annual net income deficit. Id., 360–61. Our Supreme Court held that the trial court's financial orders constituted an abuse of discretion because, "[u]nder the trial court's order, the defendant was forced to the brink of abject poverty by his obligations to pay the required alimony and insurance premiums, and then stripped of any means with which to pay them by the disproportionate division of the marital assets." Id., 363; see also *Pellow* v. *Pellow*, 113 Conn. App. 122, 124, 129, 964 A.2d 1252 (2009) (periodic alimony award of $4500 per month, which totaled more than $70,000 per year, was abuse of discretion where it would consume more than 90 percent of obligor's *gross* income, which trial court found to be $78,796).

We conclude that the facts of this case differ significantly from the facts in *Greco* and *Valentine*. In the present case, although the support and vehicle loan payment orders leave the defendant with net income of $134 weekly, which amounts to approximately 10 percent of his net weekly income, the support orders

are not excessive in light of the duration of such orders and the assets awarded to the defendant in the dissolution. First, we note that the court ordered time limited alimony and found that, in light of the facts and circumstances of the case, a six year period of alimony was appropriate.[10] The court further ordered that the term of alimony could not be extended.

Second, the defendant received substantial assets in the dissolution, including $200,000 in proceeds from the sale of the marital home; $6285 in bank accounts; stocks, bonds, and mutual funds in the amount of $116,725; real estate and property in Brazil worth $131,409; $56,454 from his retirement accounts; and the 2016 Mazda CX5 valued at $16,860. Accordingly, the present situation is unlike that in *Greco* and *Valentine* because, here, the court awarded valuable assets from the marital estate to the defendant, which assets he could use to comply with the court's support orders and to sustain his basic welfare. The court expressly recognized the parties' history of using assets to meet their expenses, stating that "[t]he income earned by the defendant was never enough to pay all of the household expenses." Furthermore, unlike in *Greco* and *Valentine*, the distribution of assets was essentially even, with both parties receiving approximately 50 percent of the marital property. On the basis of the foregoing, we conclude that the support orders did not constitute an abuse of discretion.

II

We next address the defendant's claim that the court abused its discretion in entering a relocation order that the parties did not request. Specifically, he contends that the trial court improperly "unilaterally modified" language in the parties' pendente lite parenting plan to permit the plaintiff to relocate thirty-five miles from her current residence, where the parenting plan permitted relocation thirty-five miles from the other parent's residence. We disagree that the court abused its discretion.

The following additional facts and procedural history are relevant to this claim on appeal. The parties had entered into a pendente lite custody and parenting access plan dated July 19, 2018. The pendente lite plan provided joint legal and shared physical custody of the parties' children and designated the plaintiff as the primary residential parent. Article eleven of the plan discussed relocation and provided: "Neither party shall relocate with the minor children outside the state of Connecticut or more than thirty-five . . . miles from the other parent's residence, unless the parties agree otherwise in writing. Each party shall provide the other party with at least ninety . . . days advance notice of their intention to relocate providing the proposed relocation and the reason for said relocation. In the event the parties do not reach an agreement, in writing, either party may petition the court for a determination of

same; however, in no event shall either party relocate until further order of the court."

At trial, the plaintiff testified regarding her educational plans related to ensuring her long-term financial stability. Specifically, she testified that she had been accepted into a doctorate program in clinical psychology at the University of Albany. In order to receive a discounted tuition rate, the plaintiff maintained that she would need to be a resident of the state of New York. The plaintiff estimated that it would take her six years to complete the doctorate program. On the basis of her acceptance into the University of Albany program, the plaintiff requested a modification to the relocation provision of the pendente lite parenting plan.

In opening statements, the plaintiff's counsel stated that the plaintiff was requesting "that she be allowed to reside within the radius allowed . . . within [the] parenting plan; however, with one caveat. The radius right now is thirty-five miles *from . . . the parties' residence in Newtown, Connecticut.* She asks that it be also within the state of New York . . . ." During her testimony, the following exchange occurred between the plaintiff's counsel and the plaintiff:

"Q. Are you asking the court to slightly modify this plan?

"A. Yes, I am.

"Q. How so?

"A. I would just like to keep the parenting plan as is because I know that is important to the court and I would—I live on the border of New York so I would only ask that I would have an opportunity to relocate within those thirty-five miles on the border so that I can receive the tuition that this school offers and therefore I would be the one driving to school and taking the, you know, I would be taking the—I don't know what the word would be—the difficult driving time and not . . . make any—alter anybody else's schedule, basically.

"Q. So you mentioned thirty-five miles. Is there a relocation provision in this plan?

"A. It says that there's a *radius of thirty-five miles from our residence on this date.*

"Q. And it limits you from going outside of the state of Connecticut; is that correct?

"A. That's correct.

* * *

"Q. [D]o you know where the defendant wants to move?

"A. Yes, I do.

"Q. And where is that?

"A. Old Greenwich, Connecticut.

"Q. And giving his pending move to Greenwich does—do you think New York makes sense for you?

"A. Yes. Absolutely. It's on the border.

"Q. Might it be easier if the defendant was in Greenwich and you were just across the border?

"A. Yes, it would be." (Emphasis added.)

At trial, the defendant testified that he was "liv[ing] at [his] father's house temporarily" in Newtown. The plaintiff entered into evidence an August 29, 2018 letter from the defendant's counsel to the plaintiff's counsel stating that the defendant intended to relocate within thirty-five miles of the marital residence to Old Greenwich. The letter cited greater employment opportunities in the lower Fairfield County/New York City area than the greater Danbury area and indicated that an exact address would be provided to the plaintiff once a lease agreement was finalized.

While the plaintiff was testifying on cross-examination, the court clarified her request, stating: "But if I understand your request, which I have not said I agree or disagree with, as I understand your request was to be able to move within the thirty-five miles called for in the separation agreement, but you may have to cross the state line in New York but within that thirty-five mile radius. Is that correct?" The plaintiff confirmed that the court's understanding was correct.

In its memorandum of decision, the court found that the parties' pendente lite July 19, 2018 custody and parenting access plan was in the best interests of the children with one exception. The court eliminated the reference to "outside the state of Connecticut" and ordered that "[t]he plaintiff has the right to relocate with the minor children to the state of New York provided it is not more than thirty-five . . . miles from her current residence."[11]

On appeal, the defendant argues that "the record did not support the trial court's conclusion that permitting the plaintiff to relocate thirty-five miles from her current residence, rather than the mutually agreed upon thirty-five miles from the other parent's residence, is in the minor children's best interests." (Emphasis omitted.) The defendant maintains that both parties made "pointed requests"—with the plaintiff requesting that the court remove the language prohibiting her from relocating outside Connecticut and the defendant requesting that the court retain that language. The defendant states that the court "made no mention or reference to the defendant's residence or the ample evidence in the record that he intends to relocate to Old Greenwich." (Emphasis omitted.) Thus, the defendant contends that the court abused its discretion in deciding a matter that was not put in issue by either party. He

further argues that the court's order violated his right to due process, "as it denied him any notice of the issue and the opportunity to be heard on it."

We first set forth applicable legal principles and our standard of review. The authority of a trial court to render custody, visitation and relocation orders is set forth in General Statutes § 46b-56 (a), which provides in relevant part that "[i]n any controversy before the Superior Court as to the custody or care of minor children . . . the court may make or modify any proper order regarding the custody, care, education, visitation and support of the children . . . ."[12] "[Section] 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to 'consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of [sixteen enumerated] factors. . . . The court is not required to assign any weight to any of the factors that it considers.' " *Noonan* v. *Noonan*, 122 Conn. App. 184, 189, 998 A.2d 231, cert. denied, 298 Conn. 928, 5 A.3d 490 (2010).

"Our standard of review of a trial court's decision regarding custody, visitation and relocation orders is one of abuse of discretion. . . . [I]n a dissolution proceeding the trial court's decision on the matter of custody is committed to the exercise of its sound discretion and its decision cannot be overridden unless an abuse of that discretion is clear. . . . The controlling principle in a determination respecting custody is that the court shall be guided by the best interests of the child. . . . In determining what is in the best interests of the child, the court is vested with a broad discretion. . . . [T]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . .

"The trial court has the opportunity to view the parties [firsthand] and is therefore in the best position to assess the circumstances surrounding a dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant. . . . [E]very reasonable presumption should be given in favor of the correctness of [the trial court's] action. . . . We are limited in our review to determining whether the trial court abused its broad discretion to award custody based upon the best interests of the child as reasonably supported by the evidence." (Citations omitted; internal quotation marks omitted.) *Ford* v. *Ford*, 68 Conn. App. 173, 187–88, 789 A.2d 1104, cert. denied, 260 Conn. 910, 796 A.2d 556 (2002).

In the present case, the court determined that it was in the best interests of the parties' children for the plaintiff to be permitted to relocate just over the New York border, where she could establish residency and thus afford to pursue the doctorate program to which she had applied and been accepted. The court expressly found that this professional degree, which would take six years to complete, would provide the plaintiff a necessary opportunity for meaningful employment and income. Relatedly, as the court's alimony award was time limited, terminating after six years, there was a need for the court to craft an order reasonably assuring a plan for self-sufficiency at the expiration of those six years. The court retained the parents' acknowledgement, expressed in their pendente lite agreement, that a maximum of thirty-five miles between their homes was in the best interest of their children. The court reasonably and logically tethered that distance limit to the plaintiff's current home in Newtown, as she was the party, during the dissolution hearing, seeking the court's permission to relocate. Accordingly, we are not persuaded that the court abused its discretion or deprived the defendant of due process.[13] Moreover, with respect to potential future residential relocations, we do not read the court's order as deviating from the parties' expressed belief and agreement that it is in the best interest of their children that the parties live within thirty-five miles of each other unless agreed otherwise in writing.

## III

Lastly, we address the defendant's claim that the amount of the attorney's fees awarded reflected an abuse of the court's discretion. We disagree.

The following additional procedural history is relevant to this claim on appeal. On October 13, 2017, the plaintiff filed a motion for attorney's fees pendente lite. The court, *Eschuk, J.*, held a hearing on this motion on February 5 and May 31, 2018. Both parties filed financial affidavits and testified. The plaintiff's counsel, Attorney Danielle Edwards, submitted two affidavits of attorney's fees, one dated December 12, 2017, and another dated January 3, 2018. At the hearing on May 31, 2018, Attorney Edwards was cross-examined by the defendant's counsel as to her representation of the plaintiff. Attorney Edwards testified that the matter was originated by Attorney Paul Tusch, who was the supervising attorney. Attorney Edwards testified regarding her representation of the plaintiff in the temporary restraining order proceeding in September, 2017, for which the plaintiff was billed a total of $22,886.25. Attorney Edwards, who previously had not conducted a restraining order hearing, worked 68.5 hours on the matter, for which the client was billed $20,550, and Attorney Tusch spent four hours, for which the client was billed $2300.[14] With respect to the dissolution,

Edwards testified, in response to questions from the defendant's counsel, regarding billing entries for conferences with other attorneys at her firm.

The defendant entered into evidence billing records of his attorney, Jill H. O'Connor, from September, 2017 through April, 2018. The total amount billed was $60,521.10, which included representation for the restraining order proceeding and dissolution proceedings. In closing argument on the fee request, the defendant's counsel argued, inter alia, that the fees requested were excessive and unreasonable because Attorney Edwards was inexperienced in family law and "a lot of the time" was spent being mentored by other attorneys in the firm. The defendant's counsel also argued that the fees should be equalized. Specifically, she contended that because the defendant had paid approximately $60,000 in attorney's fees, any award of attorney's fees to the plaintiff's counsel should be limited to the difference between the $60,000 the defendant had paid his attorney and the amount the plaintiff already had paid her attorney.

On May 31, 2018, the court issued an order in which it found no "egregious misconduct by either party, notwithstanding the lengthy temporary restraining order hearing." It found that the plaintiff had a right to have an attorney represent her in this case, and that she "does not have enormous assets with which to pay her attorney." It found that the plaintiff had selected Attorney Edwards, who, at the time, had one of the lowest hourly billing rates at the Cacace, Tusch, & Santagata law firm. The court found that it was "not unusual" for more experienced attorneys at the law firm to mentor Attorney Edwards "given her experience as a practicing attorney at the time." As to the requested fees of $82,151.09, the court found that some of the fees charged by more senior partners at the law firm were excessive. It further found that although the plaintiff's attorney's fees "are not easy to pay," the defendant has the assets to do so.

On the basis of these findings, the court adjusted the fees charged by more senior attorneys at the law firm and reduced the requested sum of $82,151.09 to $75,000.[15] It then ordered the defendant to pay the $75,000 by June 30, 2018.

On appeal, the defendant claims that the fees ordered were unreasonable because Attorney Edwards was inexperienced in restraining order applications, and her inexperience was "reflected in the significant disparity between the hours billed by [the] plaintiff's counsel versus the hours billed by defense counsel." Acknowledging that the court "reduced a handful of the billing entries from other partners who had assisted" Attorney Edwards, the defendant contends that the court should have reduced Edwards' own entries, which he maintains were excessive and unreasonable. We disagree

that the court abused its discretion.

"When making an order for the payment of attorney's fees, the court must consider factors that are essentially the same as those that must be considered when awarding alimony. . . . [General Statutes §] 46b-62 governs the award of attorney's fees in dissolution proceedings and provides that the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in [§] 46b-82. . . . This reasonableness requirement balances the needs of the obligee spouse with the obligor spouse's right to be protected from excessive fee awards. . . .

"Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so. . . . An exception to the rule . . . is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine its prior financial orders . . . . Whether to allow counsel fees [under §§ 46b-62 and 46b-82], and if so in what amount, calls for the exercise of judicial discretion. . . . An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Citations omitted; internal quotation marks omitted.) *Lynch* v. *Lynch*, 153 Conn. App. 208, 246–47, 100 A.3d 968 (2014), cert. denied, 315 Conn. 923, 108 A.3d 1124, cert. denied, 577 U.S. 839, 136 S. Ct. 68, 193 L. Ed. 2d 66 (2015).

"Courts have a general knowledge of what would be a reasonable attorney's fee for services which are fairly stated and described. . . . [C]ourts may rely on their general knowledge of what has occurred at the proceedings before them to supply evidence in support of an award of attorney's fees. . . . The court [is] in a position to evaluate the complexity of the issues presented and the skill with which counsel had dealt with these issues. . . . While the decision as to the liability for payment of such fees can be made in the absence of any evidence of the cost of the work performed . . . the dollar amount of such an award must be determined to be reasonable after an appropriate evidentiary showing." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Panganiban* v. *Panganiban*, 54 Conn. App. 634, 644, 736 A.2d 190, cert. denied, 251 Conn. 920, 742 A.2d 359 (1999).[16]

In the present case, the court had before it robust evidence from which to determine the reasonableness of the fees. Specifically, during the hearing on the plaintiff's motion for attorney's fees, Attorney Edwards testified as to the services she rendered, her level of experi-

ence, and her consultation with other attorneys at her firm. Moreover, the plaintiff's attorney submitted two fee affidavits with attached billing records.

The defendant's central challenge to the attorney's fees award is that the court should have reduced Attorney Edwards' billing entries on the basis that her alleged inexperience resulted in excessive billing. In making its award, the court justifiably considered the services rendered by the plaintiff's counsel and her skill level and corresponding billing rate. In fact, the court remarked during the hearing that, although a more experienced attorney would take less time to perform a task, the hourly rate of such attorney would be higher. The court further remarked that "while it might be that [the plaintiff] could have gotten a cheaper firm of attorneys, it is a good firm, and she's entitled within reason to select a competent firm that she feels comfortable with. She selected or had selected for her probably the lowest fee earner amongst those qualified as attorneys. That being the case, it is not inappropriate for the firm to have mentored Attorney Edwards to some extent." The court then determined that certain billing entries by partners of the firm were excessive, and identified on the record examples of entries it was reducing. Overall, the court reduced the fees requested by approximately $7000. Considering the foregoing, we conclude that the court appropriately considered Attorney Edwards' experience in assessing the reasonableness of the fee request and that its resulting award was not an abuse of its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

[1] The defendant appealed from the court's pendente lite attorney's fee order on June 20, 2018. Following the court's November 30, 2018 judgment dissolving the parties' marriage, the defendant filed a second appeal, which was treated as an amended appeal by this court.

[2] Although the defendant previously had included the 2016 Mazda CX5 on his financial affidavits, the defendant's September 18, 2018 financial affidavit did not include that vehicle. The court rejected as not credible the defendant's claim that the vehicle, although titled in his name, was owned by his father.

[3] The defendant took five trips in 2018. The trial court found: "On April 10, 2018, the defendant flew from JFK to Sao Paulo to attend a wedding of a friend. The total airfare was $975.08. On June 5, 2018, the defendant flew from JFK to Panama City and on to Rio de Janeiro returning on June 12, 2018. The total cost of the airfare was $979.49. The reason for the trip was to spend his fortieth birthday in Brazil with friends. On June 23, 2018, the defendant flew from Newark Liberty International Airport to Frankfurt and on to Budapest. He returned from Budapest on July 5, 2018. The total fare was $2114.31. The reason for the trip was to take a vacation.

"On August 13, 2018, the defendant flew from Newark Airport to Berlin, Germany and returned on August 21, 2018. The purpose of the flight was to attend his brother's wedding. The cost of the flight was $2614.28 for two people since he took his daughter . . . with him. He also spent $300 to $400 for a wedding present for his brother. On August 31, 2018, the defendant flew from Hartford, Connecticut to San Francisco returning on September 3, 2018. The cost of the airfare was $320 plus the hotel expense of $706.02.

The purpose of the flight was to attend a wedding of a friend. During the period of time that the defendant went on various vacations, he was not able to do any work for his employer."

[4] The court found that, under the child support guidelines, the presumptive support amount based on the defendant's financial affidavit of September 18, 2018, would be $9 per week and 89 percent of unreimbursed medical and qualified daycare costs. The court found that application of the guidelines would be inappropriate and inequitable and invoked the defendant's earning capacity as a deviation criterion.

[5] The court noted the following gifts from the defendant's father: $548,000 for the purchase of the marital home, $35,200 on October 23, 2015, to purchase the 2016 Mazda CX5, $50,000 on May 3, 2017, for the defendant's birthday, $700 on October 16, 2015, $22,824 on April 27, 2016, and payment of the defendant's cost to attend the University of Chicago Booth School of Business in 2013, and the living expenses of the parties while he attended that school between 2011 and 2013. The court determined that such gifts were not received on a regular basis during the marriage and, therefore, it did not include the gifts in determining alimony.

[6] In her appellate brief, the plaintiff argues that the court's award to the defendant of "all of the defendant's inheritances shown on his financial affidavit in Brazil," is an award of "the myriad Brazilian assets" identified in the defendant's 2007 Brazilian tax return affidavit, a document introduced into evidence at trial. The defendant responds that "the plaintiff seemingly misinterprets the phrase 'financial affidavit' in the property order to mean the defendant's 2007 Brazilian tax return affidavit . . . rather than the defendant's September 18, 2018 financial affidavit." We agree with the defendant that the plaintiff misconstrues the court's language, and we reject the plaintiff's argument that the court awarded the defendant additional unspecified Brazilian assets included in the defendant's 2007 Brazilian tax return affidavit but not reflected in his financial affidavit.

[7] The defendant also requested, inter alia, that the court articulate its decision to divide the parties' marital assets approximately equally, despite the defendant's premarital contribution of his Brazilian assets and his father's contribution to the purchase of the marital home. With respect to the division of assets, the court stated: "In dividing the parties' marital assets, the court considered the defendant's Brazilian assets and his father's contribution to the purchase of the marital property. The court considered all of the provisions of General Statutes § 46b-81 (c) regarding the issue of property division. The defendant's premarital contribution of his Brazilian assets and his father's contribution to the purchase of the marital property were provisions that the court considered in dividing the marital property."

By motion dated May 20, 2019, the plaintiff sought articulation regarding the attorney's fees orders, and the court issued its articulation on June 4, 2019.

[8] At trial, the plaintiff requested that the court assign an earning capacity to the defendant of $140,000, and the defendant submitted that his earning capacity was $80,000. Neither party challenges on appeal the court's assignment of an earning capacity of $110,000.

[9] In his September 18, 2018 financial affidavit, the defendant stated that the loan payment on the 2016 Mazda CX9 was $182 weekly, while the plaintiff stated on her financial affidavit that the loan payment was $162 weekly. The trial court did not make a finding regarding the weekly loan payment on the vehicle. Although the defendant represented in his principal brief on appeal that the loan payment constituted $182 weekly, he stated in his reply brief that "[t]his discrepancy is not crucial to the defendant's argument on appeal and, therefore, the defendant will use the plaintiff's calculations of $162 for purposes of this reply brief." At oral argument before this court, the defendant's counsel stated that the defendant was willing to accept the $162 amount listed on the plaintiff's financial affidavit.

[10] The court has the discretion to structure its alimony award such that the recipient of the support has the opportunity to obtain the skills needed to achieve a standard of living outside the marriage that was enjoyed during the marriage. "[R]ehabilitative alimony, or time limited alimony, is alimony that is awarded primarily for the purpose of allowing the spouse who receives it to obtain further education, training, or other skills necessary to attain self-sufficiency." *Bornemann* v. *Bornemann*, 245 Conn. 508, 539, 752 A.2d 978 (1998).

[11] The court ordered restrictively "as long as the defendant is a resident of Connecticut that the plaintiff not file any motion in the state of New York having to do with custody and visitation. This includes a motion for

protective order and restraining order. She is not to allow anyone to file any motions on behalf of the children." The court stated that this order was "not stayed in the event of an appeal."

[12] Subsection (b) further provides: "In making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. Such orders may include, but shall not be limited to: (1) Approval of a parental responsibility plan agreed to by the parents pursuant to section 46b-56a; (2) the award of joint parental responsibility of a minor child to both parents, which shall include (A) provisions for residential arrangements with each parent in accordance with the needs of the child and the parents, and (B) provisions for consultation between the parents and for the making of major decisions regarding the child's health, education and religious upbringing; (3) the award of sole custody to one parent with appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child; or (4) any other custody arrangements as the court may determine to be in the best interests of the child." General Statutes § 46b-56 (b).

Subsection (c) provides: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision." General Statutes § 46b-56 (c).

[13] The defendant relies on the proposition that, "[i]n exercising its statutory authority to inquire into the best interests of the child, the court cannot sua sponte decide a matter that has not been put in issue, either by the parties or by the court itself. Rather, it must . . . exercise that authority in a manner consistent with the due process requirements of fair notice and reasonable opportunity to be heard." (Internal quotation marks omitted.) *Petrov* v. *Gueorguieva*, 167 Conn. App. 505, 515, 146 A.3d 26 (2016); see id., 518 (trial court's finding that start of school, which was not pleaded specifically in plaintiff's motion to modify custody, constituted material change in circumstances technically was improper). The defendant cites *Strohmeyer* v. *Strohmeyer*, 183 Conn. 353, 354–56, 439 A.2d 367 (1981), in which our Supreme Court concluded that the trial court erred in awarding the parties joint custody of the minor child, where the defendant did not contest in his pleadings or at trial the plaintiff's request for sole custody and the court stated at the end of trial that it would give sole custody to the plaintiff.

We conclude that the concerns in *Strohmeyer*, where the court awarded joint custody without a hearing on that issue, are not implicated here.

[14] When questioned as to whether Attorney Tusch was training or advising her on the restraining order matter, Attorney Edwards testified that Attorney Tusch "wrote off time that might have fallen in the training category," however, she later testified that she did not know how much time he wrote off. With respect to advising, Attorney Edwards testified that "all of the time I spent with him was relevant to making sure that our case strategy was on point and being carried out at all times the way that was best for the client."

[15] The court also explained its reduction during the hearing, stating: "[W]hile it might be that [the plaintiff] could have gotten a cheaper firm of attorneys, it is a good firm, and she's entitled within reason to select a competent firm that she feels comfortable with. She selected or had selected for her probably the lowest fee earner amongst those qualified as attorneys. That being the case, it is not inappropriate for the firm to have mentored Attorney Edwards to some extent. The extent, however, to which the mentorship took place should be something that is taken into consideration by the court. So, in going through the requested fees, I have reduced some of the fees charged by Attorney Tusch. Attorney Tusch is the—a senior partner, I believe, in the firm of Cacace, Tusch, and Santagata. His billing rate is specified to be $575 an hour. Attorney Malone, also a partner, was charging at $375 an hour. . . . I'm going to pick a couple of—of examples rather than going through this bill one by one. But for example on November 1st, 2017, I have reduced the amount charged by Attorney Tusch on October 2nd for . . . preparation for attending a hearing short calendar regarding temporary financial support, outside conference with counsel, meeting with Attorney Edwards, and the like from $4082 to $2130. I have made similar adjustments. For example, on October 13th there was a telephone conference followed up by office conferences with Attorney Tusch and Ms. Malone concerning [a] proposed visitation psychologist. Now while it might be entirely appropriate for the partners to mentor Attorney Edwards, the amount of $690 seems to the court to be a little excessive."

[16] Rule 1.5 (a) of the Rules of Professional Conduct provides: "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following: (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) The likelihood, if made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) The fee customarily charged in the locality for similar legal services; (4) The amount involved and the results obtained; (5) The time limitations imposed by the client or by the circumstances; (6) The nature and length of the professional relationship with the client; (7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) Whether the fee is fixed or contingent."

———————————————